### STATEMENT OF FACTS FOR COMPLAINT

I, Christopher Janczewski, a Special Agent (SA) with the Internal Revenue Service – Criminal Investigation (IRS-CI), Cyber Crimes Unit, Washington, D.C. Field Office, being duly sworn, depose and states as follows:

I am a Special Agent of the IRS, Criminal Investigation ("IRS-CI") and have been so employed since September 2009.  As a special agent, my responsibilities include the investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title 31, United States Code), and related offenses.  Prior to my employment as a special agent, I was a revenue agent in the Examination division of the IRS for three years.  My education includes a Bachelor's Degree in Accounting from Central Michigan University in Mt. Pleasant, Michigan.  As a special agent, I attended approximately 26 weeks of special agent training at the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia, in various aspects of criminal investigations dealing specifically with criminal law, criminal tax law, money laundering, wire fraud, seizure, and various financial investigative techniques.  I have training and experience in the enforcement of the laws of the United States, including the preparation, presentation, and service of arrest and search warrants.  I am currently assigned to the Cyber Crimes Unit of IRS-CI, have received training in criminal schemes perpetrated via the internet, and I hold a Global Information Assurance Certification of Information Security Fundamentals.

This affidavit is being submitted in support of a complaint charging David B. Pate ("Pate") with 1) Distribution of Controlled Substances (21 U.S.C. § 841(a)(1)); 2) Conspiring with Persons to Violate 21 U.S.C. §§ 841(a) (21 U.S.C. § 846); 3) Importation of Controlled Substances (21 U.S.C. § 952(a)); 4) Laundering of Monetary Instruments (18 U.S.C. § 1956(a)(2)); and 5) Conspiring to Launder Monetary Instruments (18 U.S.C. § 1956(h)).  The facts and information contained in this affidavit are based on my personal knowledge of the investigation, a review of the documents obtained in this case, and discussions with other law enforcement officers involved in the investigation. This affidavit contains information necessary to support probable cause for this complaint.  It is not intended to include each and every fact and matter observed by me or known to the government.

### JURISDICTION

This Court has jurisdiction to issue the requested warrant because, as discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.  In addition, the statute setting forth one of the federal offenses under investigation (namely 18 U.S.C. § 1956) applies extraterritorially.  *See* 18 U.S.C. § 1956(b)(2).

**PROBABLE CAUSE**

General Background

**The Tor Network**

The Tor network is designed specifically to facilitate anonymous communication over the Internet. Information documenting what Tor is and how it works is provided on the publicly accessible Tor website at www.torproject.org.

To access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle" available at www.torproject.org.[1] Use of the Tor software bounces a user's communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual internet-protocol ("IP") address (which is traditionally used to identify a user). Traditional techniques used by law enforcement to identify IP addresses are no longer viable because of the way Tor routes communications through other computers.

For example, when a user on the Tor network accesses a website, the IP address of a Tor "exit node," shows up in the website's IP log, rather than the user's actual IP address. An exit node is the last computer through which a user's communications are routed. This system is designed to prevent others from tracing the user's actual IP address back through that Tor exit node's IP address. Thus, a criminal's use of Tor makes it extremely difficult for law enforcement agents investigating a target's website to detect: 1) the host's administrators; or, 2) the users' actual IP addresses or physical locations.

Within the Tor network, entire websites can be set up as "hidden services," which operate as regular public websites with one critical exception -- the IP address for the web server is hidden and replaced with a Tor-based web address (which is a series of algorithm-generated characters, such as "asdlk8fs9dflku7f," followed by the suffix ".onion"). A user can only reach these "hidden services" if the user is using the Tor software and operating in the Tor network.

**Bitcoin ("BTC")**

Bitcoin ("BTC") is a decentralized virtual currency that is supported by a peer-to-peer network where all transactions are posted to a public ledger, called the Blockchain (which can be seen at https://Blockchain.info). Although transactions are visible on the public ledger, each transaction is only listed by a complex series of numbers that does not identify the individuals involved in the transaction. This feature makes bitcoin pseudonymous. However, it is possible to determine the identity of an individual involved in a bitcoin transaction through several different tools that are available to law enforcement. For this reason, many criminal actors who use bitcoin to facilitate illicit transactions online (*e.g.,* to buy and sell drugs or other illegal items or services) look for ways to make their transactions even more anonymous.

---

[1] Users may also access Tor through so-called "gateways" on the open Internet; however, use of those gateways does not provide users with the anonymizing benefits of the Tor network.

A BTC address is a unique token; however, BTC is designed such that one person may easily operate multiple bitcoin accounts.  Like an email address, a user can send and receive BTC with others by sending BTC to a BTC address.  People commonly have many different BTC addresses and an individual could theoretically use a unique address for every transaction in which they engage.  A BTC user can also spend from multiple BTC addresses in one transaction; however, to spend BTC held within a BTC address, the user must have a private key, which is generated when the BTC address is created and shared only with the BTC-address key's initiator.  Similar to a password, a private key is shared only with the BTC-address key's initiator and ensures secured access to the BTC.  Consequently, only the holder of a private key for a BTC address can spend BTC from the address.  Although generally the owners of BTC addresses are not known unless the information is made public by the owner (for example, by posting the BTC address in an online forum or providing the BTC address to another user for a transaction), analyzing the public transactions can sometimes lead to identifying both the owner of a BTC address and any other accounts that the person or entity owns and controls.

Law enforcement uses proprietary services offered by several different Blockchain-analysis companies to investigate BTC transactions.  These companies analyze the Blockchain to identify the individuals or groups involved with BTC transactions by creating large databases that group BTC addresses into "clusters" (using heuristics that are based on BTC-transaction metadata).  By "clustering" these addresses together, the software is able to locate commonalities and tie seemingly disparate BTC addresses to the same owner.  Through numerous unrelated investigations and trials, the analysis provided by third-party clustering software has been found to be reliable.  This same anti-money laundering clustering software is used by banks and international law enforcement organizations.

BTC is often transacted using a virtual-currency exchange, which is a virtual-currency trading platform and bank.  It typically allows trading between the U.S. dollar, other foreign currencies, BTC, and other digital currencies.  Many virtual-currency exchanges also act like banks and store their customers' BTC.  Because these exchanges act like banks, they are legally required to conduct due diligence of their customers and have anti-money laundering checks in place.

**Darknet Markets**

Darknet markets are commercial websites located within Tor's hidden services that must be accessed using Tor.  Though they can sell legal products, they function primarily as black markets, selling or brokering transactions involving drugs, unlicensed pharmaceuticals, cyber-arms, weapons, counterfeit currency, stolen credit-card details, forged documents, and other illicit goods.  BTC is the most common method of payment for products or services within darknet markets.

Generally, there are two ways BTC is exchanged when using darknet markets:

    a. A centralized method, where: (1) all transactions pass through the darknet-market's BTC addresses, (2) the darknet market takes a commission, and (3) the vendor

3

>   receives their payment from the darknet market.  This model can be likened to the clearnet site eBay.
>
> b. A decentralized method, where: (1) transactions take place directly between buyer and seller.  This model can be likened to the clearnet site Craigslist.

Based on my training and experience, when a buyer purchases drugs on a darknet market, that buyer provides the vendor with a physical address to which the drugs are shipped.  Depending on the location of the vendor and buyer, the shipment may be domestic or international.  Vendors use various methods of "stealth" to conceal drug shipments from postal inspectors, drug-sniffing dogs, and other parties who may try to intercept the contraband.  While stealth can vary among vendors, tactics include vacuum sealing, applying chemicals such as alcohol to remove odors, using coffee grounds or other agents to mask odors, and concealing the drugs within legal items such as a generic kitchen appliance.  Vendors typically print fake labels and/or use other tactics that provide an air of legitimacy for the shipment and make it seem as if it came from a well-known business.  In addition, vendors often use stamps to avoid paying for a shipment in person at the post office.

## The Investigation

In or about August 2016, IRS-CI began an investigation of "buyersclub," a prolific vendor of OxyContin (among other narcotics, such as morphine and Xanax), who operated on multiple darknet marketplaces.  OxyContin is a specific brand name for the Schedule II controlled opioid substance oxycodone.  Based on information provided by confidential sources and returns on legal process filed and executed during the course of the investigation, investigators determined that "buyersclub" was operated by David Brian Pate ("Pate"), a dual United States and Costa Rican citizen.  Evidence gathered during the course of the investigation demonstrates that Pate operated via the online monikers "buyersclub," "senorpate," "davidpate," and "expurdue" on the Silk Road darknet market, AlphaBay darknet market, as well as a variety of additional online forums and bitcoin exchanges.

At one point, in a forum chat, the individual with username "davidpate" stated outright that his "real name [wa]s david pate."  The individual with username "davidpate" also mentioned living in Guanacaste, Costa Rica (which is where Pate lived) frequently on these forums.

IRS-CI reviewed data from a virtual-currency exchange that showed that 10 BTC addresses (which belonged to David Pate) were directly receiving (or had received) BTC from darknet markets to include AlphaBay, Agora, Middle Earth, Nucleus, Abraxas, and Dream.  Based on my training and experience, the various amounts and timing of the payments from these darknet markets was consistent with pay-outs based on a vendor's sale of narcotics, which themselves are commonly listed on those markets.  The registrant (whose username was "davidpate") for these BTC addresses provided the exchange with the email address senorpate@hotmail.com.

Additional evidence that Pate is the individual controlling the senorpate@hotmail.com email account includes:[2]

    a. Based on judicially-authorized search-warrant returns, this email account (*i.e.*, senorpate@hotmail.com) belongs to David Pate. The email account was registered on or about July 9, 2012 with Microsoft Corp. with the name "David Pate" and a zip code for Chelsea, Alabama. Pate used an address in Chelsea, Alabama on accounts owned by him with Bank of America, Wells Fargo, eBay, Coinbase, PayPal, Citi Card, and the purchase of a Lexus.

    b. On March 5, 2013, senorpate@hotmail.com sent an email in which he referred to selling a couple thousand BTC and stated that his username was "EXPURDUE" and that his given name was "David Brian Pate." This email also included Pate's date and country of birth, former U.S. address, and a photo of Pate's U.S. passport.

    c. Multiple emails sent from senorpate@hotmail.com to online BTC companies contained: (1) photos of government identifying documents for Pate; and, (2) photos of Pate holding government identifications that have his name on them.[3]

    d. At least one confidential source (as discussed in more detail below) who knew Pate personally identified him through Facebook photos. Another confidential source (who had previously seen photos of Pate and was told that the individual depicted in those photos was Pate) corroborated this identification.

    e. On December 5, 2016, senorpate@hotmail.com received an email from an online gambling website about his account with the website, which had the username "buyersclub."

    f. According to subpoena returns, senorpate@hotmail.com is also registered to:

        i. Wells Fargo bank account ending in -1846, which is registered to "David Brian Pate" as the sole owner and for which the account registrant provided Pate's actual identifiers such as Pate's social security number, date of birth, home address, secondary identification, passport information, and phone number;

        ii. Wells Fargo bank account ending in -3318, which is held under the name "Dream Miners LLC" with signatory "David Brian." Although the

---

[2] "Senor Pate" translates from Spanish to English as "Mr. Pate." Purdue Pharmaceuticals is the manufacturer of OxyContin and "ex" is described below.

[3] Many virtual-currency exchanges require customers to send in pictures of the customer holding a government ID as part of the exchanges' legally required anti-money laundering program.

        registration only contains Pate's first and middle name, without a last name, there is additional information (*i.e.,* social security number, date of birth, address, phone number, secondary identification, and passport number) that identifies Pate as the "David Brian";

   iii.    a Bank of America credit-card account ending in -6270, which is held in the name of "David B Pate," and provided a known physical address and phone number for Pate;

   iv.    a Facebook account (hereafter, "Pate's Facebook account," registered using the email account senorpate@hotmail.com) in Pate's name that included multiple photos of Pate and his family in Costa Rica. Specifically, one such photo from a private message of what appears to be Pate holding two bottles of OxyContin and a package of Tafil in front of his face. His face is mostly obscured but he is shirtless and his tattoo on his left arm can be seen. There are also private messages between Pate and what appears to be his wife, Brenda Amaya Amaya's Facebook account; and

   v.    a PayPal account registered to Pate with the username "senorpate." This PayPal account is also linked to two bank accounts owned by Pate: a Bank of America account ending in -1823 (registered solely to "David B Pate") and a Compass Bank account ending in -6795 (registered solely to "David B Pate").

<u>The Silk Road Market</u>

Using software that analyzes the blockchain (which, based on prior investigations, has been found to be reliable), law enforcement was able to determine that Pate received thousands of BTC from the Silk Road market. Authorities analyzed the now-defunct Silk Road Market database and found that a vendor calling itself "expurdue" was selling 20 mg and 40 mg pills of OxyContin and withdrawing BTC to BTC addresses owned and controlled by Pate. In its listing, "expurdue" purported to have obtained the OxyContin from a pharmacy in Costa Rica. Buyers would purchase OxyContin from "expurdue," make payments to the Silk Road Market in BTC, and in turn, the Silk Road Market would send the respective BTC (minus a transaction fee) to BTC addresses provided by "expurdue."

Additionally, the Silk Road Market listing also provided the email address of Theexpurdue@tormail.org. Contents of the tormail email address (which law enforcement obtained through a judicially-authorized search warrant) corroborated that Pate was the user of the "expurdue" username and the tormail email address. For example, one email stated (when referring to receiving a MoneyGram payment): "send to david Pate in Alajuela, costa rica." Further, as noted above, in March 2013, the senorpate@hotmail.com account also sent an email identifying its user as Pate with a user name of "EXPURDUE."

The "expurdue" account received and withdrew approximately 15,785.965 BTC (worth $469,520.24 at the time of transaction) from the Silk Road Market for the period December 2012 through February 2013.

### AlphaBay Market

On or about September 2, 2016, law enforcement analyzed the now-defunct AlphaBay Market and found the vendor, "buyersclub," who had two listings for the sale of OxyContin in 20mg and 40mg dosages. The listings on the Silk Road Market ("expurdue") and AlphaBay Market vendor ("buyersclub") were styled very similarly and shared the following characteristics: 1) both vendors were selling 20mg and 40mg OxyContin pills; 2) both sold "old formula" pills made by Purdue (though "expurdue['s]" listing stated that it obtained pills from a pharmacy and shipped from Costa Rica);[4] and, 3) the AlphaBay Market listing ("buyersclub") displayed a photo of an OxyContin bottle with a Spanish-language label, consistent with the export version of OxyContin that would be available in Costa Rica, and the "buyersclub" vendor's profile states that it ships its product from Central America. As noted above, "expurdue" on the Silk Road Market stated it shipped from Costa Rica. Given the similarities between the profiles (including product consistencies, language similarities in the product's advertisements for sale, and shipment locations) and the connected BTC activity, law enforcement believes that "buyersclub" and "expurdue" are both controlled by the same person, Pate.

In general terms, based on interviews with reliable confidential sources and legal-process returns, investigators learned that Pate used many, if not all, of the above monikers and usernames to send OxyContin from Costa Rica to co-conspirators in the U.S. These co-conspirators acted as re-shippers. This allowed Pate to avoid having to make a multitude of small shipments to U.S. customers on a per-transaction basis. Rather, Pate would send periodic, high-volume OxyContin shipments to his re-shippers in the U.S. The re-shippers would then repackage and reship the drugs to each U.S. customer on a per-sale basis at Pate's direction. Based on my experience and knowledge, I know that the use of U.S. based re-shippers decreases the number of contraband packages that would have to clear customs and significantly decreases the shipping time to a buyer, as packages coming from the U.S. arrive much more quickly than from Costa Rica. The re-shippers would make international wire payments in U.S. dollars and BTC to Pate as part of this scheme.

In total, IRS-CI identified upwards of 60 BTC addresses associated with Pate. These addresses received approximately 52,691.08993617 BTC (worth approximately $3,593,003.11 at the time

---

[4] "Old formula" refers to Purdue's original OxyContin formula that did not contain tamper-resistant features, namely a crush-proof feature that prevents a user from inhaling or injecting the pills after pulverizing them. Purdue produces the old formula of OxyContin for distribution in Costa Rica (among other countries) through a pharmacy. The bottles of export OxyContin sold in Costa Rica have Spanish-language labels and contain the stamp "EX" on individual pills.

of the transactions), much of which was traced directly from darknet marketplaces. Typically, Pate used BTC exchanges to convert this BTC into U.S. dollars.

Both AlphaBay and Silk Road marketplaces are no longer active and consequently, law enforcement believes that Pate's operation is no longer operational on the darknet.

**Undercover Purchases of OxyContin from Pate a/k/a "buyersclub"**

On November 2, 2016, an undercover Drug Enforcement Administration ("DEA") task-force officer ("UC") used an undercover account, while in the District of Columbia, to access the AlphaBay Market and purchase oxycodone from "buyersclub." The UC placed an order for ten 40mg OxyContin tablets (sold at $22.00 per tablet), which the UC paid for in BTC. The UC also sent a private message (using Privnote) to "buyersclub" with the shipping address of an undercover P.O. Box in the District of Columbia for the purchased narcotics.[5]

On November 8, 2016, "buyersclub" sent the UC a Privnote message containing a United States Postal Service ("USPS") tracking number for the package that contained the oxycodone that the UC had purchased. That same day, the UC retrieved a USPS Priority Mail envelope from the undercover P.O. Box in Washington, D.C. According to USPS tracking data, the envelope originated from Eugene, Oregon on November 4, 2016. The envelope contained a smaller, sealed, and padded manila envelope (within the shipping envelope), which contained a small plastic bag with 10 pills stamped with "EX" and "40."

On January 19, 2017, the UC, while using an undercover computer in the District of Columbia, ordered an additional 10 oxycodone 40mg pills from "buyersclub" on AlphaBay Market. The UC paid in BTC for the purchase (at approximately $32.00 per tablet). On January 30, 2017, an envelope (shipped from Eugene, Oregon) was delivered to the same P.O. Box in Washington, D.C. This envelope contained a small plastic bag with 11 pills stamped with "EX" and "40."

Laboratory analysis by the DEA confirmed that a sample of the November 8, 2016, and January 19, 2017, sets of pills tested positive for the presence of oxycodone.

**Search Warrant Returns Revealed Pate and His Co-conspirators Operate a Large Scale Drug Trafficking Organization**

    **Co-conspirator 1 - Supplier in Costa Rica**

Search warrant returns for senorpate@hotmail.com revealed that one of Pate's sources of supply for OxyContin is Co-conspirator 1, a pharmacist in Costa Rica. Co-conspirator 1 (using his/her email accounts) and Pate (using senorpate@hotmail.com) communicated approximately 60 times between November 14, 2014, and November 27, 2015. These emails generally dealt with Pate obtaining prescriptions for pills (such as OxyContin), Co-conspirator 1's role in supplying Pate with large quantities of pills, and Pate's payment for those purchases.

---

[5] Privnote is a self-destructing encrypted messaging system on which only holders of the web's uniform record locator ("URL") link can access the content of the message.

For example, the following email exchange occurred between Pate and Co-conspirator 1 between October 30, 2015, and November 1, 2015:

October 30, 2015:

Pate (using senorpate@hotmail.com):

>Subject line: "try to make one more before your trip"
>
>*"i know that you are leaving soon to go on vacation and was wanting to see what you could do before leaving.*
>
>*let me know and i will see what kind of money that i can come up with and have wired to you.*
>
>*thanks, dave"*

Co-conspirator 1:

>*"Hey David.*
>
>*I can get you the same amount ready for next friday before I leave. Just like last time: 48 of the 40s and 20 of the 20s.*
>
>*Thank you, let me know..."*

Pate:

>*"will you get the prescriptions?? also the 270 30mg morphine for the 3 prescriptions that i had?*
>
>*if so let me know total price, i am trying to make plan to limon this coming week to pick up my lexus.*
>
>*thanks, dave"*

Co-conspirator 1:

>*"Right!! the morphines too!*
>
>*I will take care of the papelwork this weekend for the 40s and 20s. If I've got any problem, I will let you know."*

October 31, 2015:

9

Pate: (in part):

> "try to let me asap the total price, so that i have time to get the wire out to yoou."

Co-conspirator 1:

> "You think you can wire 18,000 or so?"

November 1, 2015:

Pate *(all caps in original)*:

> "FOR SURE.. WILL SEND IN WIRE INFO IN A BIT"

In this email exchange, Pate discussed purchasing approximately 68 "40s and 20s," which I know based on my training and experience to be a reference to OxyContin, as well as 270 30 mg, morphine pills in exchange for "18,000" as payment. Based on this exchange and others around the same time period, Pate sought over 300 40 mg OxyContin pills (in addition to 270 30 mg morphine pills) from Co-conspirator 1. Based on my training and experience, the purchases of this high volume of painkillers is not consistent with personal use; rather, it is consistent with a large-scale trafficker purchasing a supply for distribution.

### Co-conspirator 2

On March 14, 2016, law enforcement seized two packages in Florida addressed to Co-conspirator 2's residence. The packages contained approximately 8.52 pounds of 2 mg pills of Xanax.[6] Pursuant to a cooperation agreement, Co-conspirator 2 pleaded guilty to multiple felony offenses, is pending sentencing, and cooperating with law enforcement in the hope of obtaining a reduced sentence at the end of its cooperation. Law enforcement has obtained information from Co-conspirator 2 that has been corroborated by both other witnesses and through judicially-authorized legal process. Your affiant is not aware of Co-conspirator 2 having provided any untruthful information to law enforcement as part of its cooperation.

On March 16, 2016, law enforcement conducted a controlled delivery of the two packages of Xanax. Shortly after delivery, law enforcement conducted a traffic stop of a minivan that left Co-conspirator 2's home. Co-conspirator 2 and two other occupants were inside the minivan, and a search revealed a bottle of approximately 24 Xanax pills.

That same day, after law enforcement informed Co-conspirator 2 of his/her Constitutional rights and Co-conspirator 2 waived the same, Co-conspirator 2 stated that he/she had opened the two packages of Xanax. In subsequent interviews, Co-conspirator 2 recounted how s/he met Pate and developed a friendship, and how Pate would routinely send large amounts of oxycodone pills

---

[6] The Manatee County Sheriff's Office Lab subsequently identified and confirmed the pills to be Alprazolam (Xanax), a schedule IV narcotic.

packaged inside souvenirs (namely maracas) from Costa Rica to Co-conspirator 2 in Florida. Pate would then send private messages (via Pate's Facebook account and PrivNote) to Co-conspirator 2 detailing the identities and shipping information of customers to whom Co-conspirator 2 was to re-ship the pills. Co-conspirator 2 would then address packages filled with oxycodone pills and send those packages off under the guise that they were mailing trading cards.

After his/her March 2016 arrest, Co-conspirator 2 further informed law enforcement that Pate was sending another souvenir package containing a substantial amount of oxycodone. Thus, on March 25, 2016, law enforcement seized a second package (addressed to Co-conspirator 2) originating from Costa Rica, which contained the following approximate amounts of pills hidden inside maracas:

- 69.8 grams of purple 30mg Morphine pills;
- 123.9 grams of pink 20mg OxyContin pills;
- 105.6 grams of yellow 40mg OxyContin pills; and
- 109.5 grams of yellow 40mg OxyContin pills.

Additionally, communications between Co-conspirator 2 and Pate's Facebook account via Facebook messenger and Privnote detailed shipping information and instructions for the package that was seized.

Co-conspirator 2 estimated that beginning in early June 2015, Co-conspirator 2 had wired between 10 and 15 wire transfers, totaling approximately $150,000, from the bank accounts in the United States to accounts that Pate controlled that were located in Costa Rica. Pate told Co-conspirator 2 that the wire transfers were to pay doctors and pharmacies for prescriptions to obtain pills and to pay for the pills themselves.

According to Co-conspirator 2: (a) he/she received the first package of OxyContin pills from Pate sometime in early June of 2015; (b) the package contained approximately 400 OxyContin pills; (c) Co-conspirator 2 sold those 400 OxyContin pills to a local drug dealer in Florida for approximately $6,700; and (d) per Pate's instructions, Co-conspirator 2 then wired the $6,700 to Pate in Costa Rica via Western Union. Between early June of 2015 and late July of 2015, Pate sent Co-conspirator 2 several similarly packaged shipments of OxyContin, which Co-conspirator 2 resold to a local drug dealer, at a profit of between $18,000 and $24,000. Again, in accordance with Pate's instructions, Co-conspirator 2 laundered these proceeds to Pate in Costa Rica via Western Union.

According to Co-conspirator 2, he/she began shipping OxyContin and Xanax to darknet market customers throughout the United States sometime in late July 2015. Co-conspirator 2 was familiar with Pate's moniker on AlphaBay, "buyersclub," having discussed it with Pate and seen it on the darknet market himself. Co-conspirator 2 estimated that Pate sent approximately two packages per month from Costa Rica, which could contain as much as 10,000 OxyContin pills per package, and were concealed inside of maracas or other souvenir items.

Thus, according to Co-conspirator 2, the darknet/AlphaBay sales portion of the scheme worked as follows: (a) Pate would send Co-conspirator 2 a list of customer orders which included the customer's name, the customer's shipping address, and the quantity to be sent; (b) Co-conspirator 2 then created smaller packages of pills; (c) Co-conspirator 2 mailed (typically via USPS) the pills to the customer; (d) once the shipment(s) was received by the buyer, the marketplace would release funds in bitcoin (which were held in escrow until the transaction was completed) into Pate's account on the darknet market; (e) Pate would then convert the bitcoin to fiat currency and send it to a bank account that he shared with Co-conspirator 2; and (f) Co-conspirator 2 would then launder the proceeds from the United States to Pate in Costa Rica.

In late fall of 2015, Pate told Co-conspirator 2 that Pate had earned over $790,000 in two months selling illicit narcotics on the darknet.

On or about August 20, 2018, Co-conspirator 2 met with agents and positively identified Pate using photos from Pate's Facebook account.

### Co-conspirator 3

On February 14, 2018, Costa Rican law enforcement seized a package at the Juan Santamaria International Airport in Costa Rica. The package label indicated that it had been shipped by "David Brian Pate ND" via DHL to Co-conspirator 3 in New York. The package also listed Co-conspirator 2's telephone number as the telephone number for the individual receiving the package. A report obtained from the Costa Rican authorities indicated that the package contained a total of approximately 717 pills hidden inside maracas. As with Co-conspirator 2, Pate relayed shipping information to Co-conspirator 3 via Facebook messenger (using Pate's Facebook account) and Whatsapp messaging; law enforcement obtained messages that corresponded to this seized package.

On March 29, 2018, law enforcement interviewed Co-conspirator 3 (who is related to Pate and resided at the destination address listed on the seized package). Co-conspirator 3 told law enforcement that he/she normally received packages from Pate through the mail, and that the packages typically contained three different types of pills (frequently hidden in maracas), each a different color. Pate, using senorpate@hotmail.com and other electronic communications, would then email Co-conspirator 3 with instructions on the particulars of each re-shipment (*i.e.*, how many pills to ship, shipping information, and customer information). Following these instructions, Co-conspirator 3 repackaged the pills into smaller quantities and re-shipped the pills to Pate's customers all over the United States. Co-conspirator 3 provided law enforcement with a composition notebook that included details from shipments that Co-conspirator 3 re-shipped.

### Customer 1

Search warrant returns for Pate's Facebook account revealed that a U.S. citizen living in Costa Rica ("Customer 1") communicated with Pate from on or about May 2017 through on or about June 2018 about acquiring pills and/or prescriptions from Pate. Customer 1 generally requested two bottles of 40 mg OxyContin and occasionally dosages of Xanax. Customer 1 purchased directly from Pate and the deliveries were to Customer 1 in Costa Rica.

On October 20, 2018, Customer 1 flew from Costa Rica to Houston, Texas. Law enforcement interviewed Customer 1 at secondary screening upon his/her entry to the United States. Customer 1 confirmed at the interview that his/her spouse was addicted to painkillers and that they acquired the pills from Pate. Customer 1 provided an email he/she wrote to Pate dated March 17, 2017, wherein Customer 1 had a coded conversation with Pate about purchasing narcotics. Additionally, Customer 1 confirmed and identified a message from June 6, 2018 in which Pate sent Customer 1 a photo of himself holding two bottles of OxyContin and a third bottle of unidentified pills.

**CONCLUSION**

Accordingly, based on the above facts, your affiant submits that there is probable cause to believe that between on or about February 27, 2013, and including on or about June 6, 2018, within the District of Columbia, Pate committed the offenses of: 1) Distribution of Controlled Substances (21 U.S.C. § 841(a)(1)); 2) Conspiring with Persons to Violate 21 U.S.C. §§ 841(a) (21 U.S.C. § 846); 3) Importation of Controlled Substances (21 U.S.C. § 952(a)); 4) Laundering of Monetary Instruments (18 U.S.C. § 1956(a)(2)); and 5) Conspiring to Launder Monetary Instruments (18 U.S.C. § 1956(h)).

_____
Special Agent Christopher Janczewski
Internal Revenue Services, Criminal Investigation

Sworn and subscribed to before me this _____ day of September, 2019.

_____
United States Magistrate Judge